UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DAVID VERNAREC,                    :
                                   :
        Plaintiff                  :    No. 4:10-CV-1275
                                   :
    vs.                            :    (Complaint Filed 6/18/10)
                                   :
MICHAEL ASTRUE,                    :
COMMISSIONER OF SOCIAL             :    (Judge Munley)
SOCIAL SECURITY,                   :
                                   :
        Defendant                  :

## MEMORANDUM AND ORDER

## Background

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff David Vernarec's claim for social security
disability insurance benefits and supplemental security income
benefits.  For the reasons set forth below we will affirm the
decision of the Commissioner.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It
is undisputed that Vernarec met the insured status requirements
of the Social Security Act through September 30, 2010. Tr. 13, 15

and 130.[1]

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

Vernarec was born in the United States on April 17, 1966. Tr. 47, 76, 100 and 107.  Vernarec completed the 10th grade and can read, write, speak and understand the English language. Tr. 133.  Vernarec has past relevant employment[2] as a cable installer which was described as skilled, medium work by a vocational expert.[3] Tr. 71.

---

1. References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on September 13, 2010.

2. Past relevant employment in the present case means work performed by Vernarec during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

3. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work.*  Light work involves lifting no more than 20 pounds at a time with frequent lifting or

Records of the Social Security Administration reveal that Vernarec had earnings from January 1, 1995, through 2009, the fifteen years prior to the date his claim was adjudicated, as follows:

| | |
|---|---|
| 1995 | $ 26583.72 |
| 1996 | 22005.47 |
| 1997 | 51020.00 |
| 1998 | 52132.28 |
| 1999 | 55630.39 |
| 2000 | 50933.94 |
| 2001 | 49701.36 |
| 2002 | 22189.38 |
| 2003 | 49344.11 |
| 2004 | 3055.65 |

---

carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

3

```
                     2005                614.00
                     2006               7209.00
                     2007               9981.72
                     2008                  0.00
                     2009                  0.00
```

Tr. 117.  Vernarec's total earnings from 1995 through 2009 were
$400,401.02. Tr. 117.

        Vernarec claims that he became disabled on April 15,

2004,[4] because of degenerative spondylosis,[5] knee pain, major

---

4. Vernarec was 37 years of age on the alleged disability onset
date  and only 43 years of age at the time of the administrative
law judge's hearing held on June 6, 2009.  Vernarec is considered
a "younger individual" whose age would not seriously impact his
ability to adjust to other work.  20 C.F.R. §§ 404.1563(c) and
416.963(c).

5. Degenerative disc disease has been described as follows:

        As we age, the water and protein content of the
        cartilage of the body changes. This change results in
        weaker, more fragile and thin cartilage. Because both
        the discs and the joints that stack the vertebrae
        (facet joints) are partly composed of cartilage, these
        areas are subject to wear and tear over time
        (degenerative changes). The gradual deterioration of
        the disc between the vertebrae is referred to as
        degenerative disc disease. Wear of the facet cartilage
        and the bony changes of the adjacent joint is referred
        to as degenerative facet joint disease or
        osteoarthritis of the spine.

        Degeneration of the disc is medically referred to as
        spondylosis. Spondylosis can be noted on x-ray tests or
        MRI scanning of the spine as a narrowing of the normal
        "disc space" between the adjacent vertebrae.

Degenerative Disc Disease & Sciatica, MedicineNet.com,
http://www.medicinenet.com/degenerative_disc/page2.htm (Last
accessed September 6, 2011).  Degenerative disc disease is
considered part of the normal aging process.  Id.

4

depressive disorder and an anxiety-related disorder. Document 13, Plaintiff's Brief, p. 1; Tr. 134 and 170.  Vernarec's last employment was in July, 2007.[6] Tr. 134.

On October 30, 2007,  Vernarec filed protectively[7] an application for supplemental security income benefits and on November 7, 2007, an application for disability insurance benefits. Tr. 13, 76-77, 99 and 100-112.  On April 18, 2008, the Bureau of Disability Determination[8] denied Vernarec's applications. Tr. 79-87. On May 22, 2008, Vernarec requested a hearing before an administrative law judge. Tr. 88-89.  Approximately 13 months later, a hearing before an administrative law judge was held on June 30, 2009. Tr. 40-75.  On August 10, 2009, the administrative law judge

---

6. As will be explained *infra* Vernarec did engage in substantial gainful activity after his alleged onset date of April 15, 2004. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 416.910.  In order to amount to substantial gainful activity the individual's earnings have to rise to at least a minimum level set by regulations of the Social Security Administration.

7. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

8. The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 79 and 83.

issued a decision denying Vernarec's applications. Tr. 13-23.   On April 29, 2010, Vernarec requested that the Appeals Council review the administrative law judge's decision and on April 29, 2010, the Appeals Council concluded that there was no basis upon which to grant Vernarec's request for review. Tr. 1-3.   Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On June 18, 2010, Vernarec filed a complaint in this court requesting that we reverse the decision of the Commissioner denying him social security disability insurance and supplemental security income benefits.   The Commissioner filed an answer to the complaint and a copy of the administrative record on September 13, 2010. Vernarec filed his brief on January 11, 2011, and the Commissioner filed his brief on February 14, 2011.   The appeal[9] became ripe for disposition on March 3, 2011, when Vernarec elected not to file a reply brief.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.   See <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>,   181 F.3d 429, 431

---

9. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."   M.D.Pa. Local Rule 83.40.1.

(3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere

scintilla of evidence but less than a preponderance.  Brown, 845
F.2d at 1213.  In an adequately developed factual record substantial
evidence may be "something less than the weight of the evidence, and
the possibility of drawing two inconsistent conclusions from the
evidence does not prevent an administrative agency's finding from
being supported by substantial evidence." Consolo v. Federal
Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all
the other evidence in the record," Cotter, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts from
its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488
(1971).  A single piece of evidence is not substantial evidence if
the Commissioner ignores countervailing evidence or fails to resolve
a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The
Commissioner must indicate which evidence was accepted, which
evidence was rejected, and the reasons for rejecting certain
evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.
Therefore, a court reviewing the decision of the Commissioner must
scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968,
970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d
Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful

8

activity by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance and supplemental security income
claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos,
474 F.3d at 91-92.  This process requires the Commissioner to
consider, in sequence, whether a claimant (1) is engaging in
substantial gainful activity,[10] (2) has an impairment that is severe

---

10. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

9

or a combination of impairments that is severe,[11] (3) has an
impairment or combination of impairments that meets or equals the
requirements of a listed impairment,[12] (4) has the residual
functional capacity to return to his or her past work and (5) if
not, whether he or she can perform other work in the national
economy. Id.  As part of step four the administrative law judge must
determine the claimant's residual functional capacity. Id.[13]

---

11. The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two.  Id.  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

12. If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step.

13. If the claimant has the residual functional capacity to do his
or her past relevant work, the claimant is not disabled.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id</u>; 20 C.F.R. §§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**<u>MEDICAL RECORDS</u>**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Vernarec's medical records.

The first medical records that we encounter are from 2002. On February 14, 2002, Vernarec was taken by ambulance to the Lehigh Valley Hospital emergency department. Tr. 199.   Vernarec overdosed on Xanax, Effexor, Metoprolol[14] after consuming a large quantity of

---

14. Xanax is a drug used to treat anxiety.  Xanax, Drugs.com, http://www.drugs.com/xanax.html (Last accessed September 6, 2011).  Effexor is a drug used to treat major depression and anxiety.  Effexor, Drugs.com, http://www.drugs.com/effexor.html (Last accessed September 6, 2011).  Metoprolol (also known as Lopressor) is a drug used to treat angina and high blood pressure.  Metoprolol, Drugs.com, http://www.drugs.com/metoprolol .html (Last accessed September 6, 2011).

alcohol. Id.  Vernarec's blood alcohol level at the time of
admission to the emergency department was .310, almost four times
the legal limit.[15] Tr. 186 and 190.  The medical records indicate
that Vernarec "consumed 50 pills (Effexor HTN medication)" and
"denied he had been experiencing suicide ideas prior to becoming
intoxicated." Tr. 186.  He further stated that "he had been
experiencing stress over dissolution of marriage" and "expressed
remorse over the incident." Id.  Vernarec was held at the hospital
overnight.  A report prepared by Gary Bonfante, D.O., on February
15, 2002, states in part as follows: "Patient was seen and examined
by my colleague Dr. Jim McHugh . . . .Patient apparently has a
history of alcohol abuse, has previously been in rehab and recently
started to drink again after he became estranged from his wife . . .
This morning patient is sober . . . Has absolutely no desire to
further harm himself and is agreeable to outpatient follow up." Tr.
198. Vernarec was discharged from the hospital on February 15, 2002.
Tr. 187, 198 and 201.  At discharge it was noted that he had
suffered an "acute depression" and "OD" and that he had improved.
Tr. 203.[16]

---

15. The legal limit in Pennsylvania is .08 percent.  75 Pa.C.S.A.
§ 3731.

16. Counsel for Vernarec incorrectly states that restraints were
used on Vernarec during this visit to the hospital. Doc. 13,
Plaintiff's Brief, p. 4. The medical record states that the
intervention utilized was "6" which is a designation for "Direct
Observation -Family/Staff." Tr. 194.

On May 4, 2004, Vernarec had an appointment with Paul Webb, M.D., of Wyalusing Guthrie Clinic.  Tr. 208-209.  At that appointment Vernarec complained of pain in his legs and feet.  Dr. Webb's medical notes are difficult to decipher but we can discern that Dr. Webb's assessment was that Vernarec suffered from high blood pressure and foot pain. Tr. 209.  Dr. Webb refilled Vernarec's prescription for Metoprolol. Id.  It was noted that Vernarec's blood pressure was 130/86.[17] Tr. 208.

On October 28, 2004, Vernarec had an appointment with Dr. Webb. Tr. 206.  At that appointment Vernarec complained of a knee injury and requested a prescription for Darvocet.[18] Id.  Dr. Webb noted that Vernarec's left knee was swollen. Tr. 207.  Dr. Webb ordered an MRI and prescribed Darvocet. Id.  Dr. Webb also in the notes of this appointment stated that Vernarec "owns [a] Pizza shop." Tr. 206.

On December 3, 2004, Vernarec had an appointment with Jose Nazar, M.D. Tr. 216.  Dr. Nazar in the treatment notes states as follows: "Patient was sent to this office by Dr. Biancarelli with a

---

17. A website of the National Institute of Health reveals that blood pressure of 120/80 is normal blood pressure; blood pressure between 120/80 and 139/89 is prehypertension; and blood pressure of 140/90 or higher is high blood pressure.  High Blood Pressure, MedlinePlus, http://www.nlm.nih.gov/medlineplus/highbloodpressure .html (Last accessed September 6, 2011).

18. Darvocet, a combination of propoxyphene and acetaminophen, is a narcotic pain reliever. Darvocet, Drugs.com, http://www.drugs. com/darvocet.html (Last accessed September 6, 2011).

history of pain at the level of the left knee for several months. He was on a dock at a lake and twisted his knee and had pain and discomfort.  It has slowly been getting better." Id.  Dr. Nazar's examination of Vernarec's knee revealed that Vernarec had full range of motion of the left knee and no evidence of phlebitis.[19] Id.  An x-ray of the left knee was negative for fractures or dislocations. Id.  Dr. Nazar prescribed Vicodin and advised him to perform range of motion exercises. Id.

On December 7, 2004, Vernarec had an MRI of the left knee which revealed "small to moderate joint effusion and oblique tear of the posterior horn of the medial meniscus." Tr. 220.

On January 10, 2005, Vernarec had an appointment with Dr. Nazar. Tr. 215.  Dr. Nazar's notes of that appointment state as follows: "Patient is here today for follow up and discussion of the MRI, which is positive for a tear of the posterior horn of the medial meniscus. . . . Due to the fact that he has not improved, I will schedule him for left knee arthroscopy . . . ." Id.

On March 8, 2005, Vernarec underwent surgery (left knee arthroscopy with meniscectomy) performed by Dr. Nazar for a left knee meniscus tear.  Tr. 210.

On March 11, 2005, Vernarec had a follow-up appointment

---

19. Phlebitis is "inflamation of a vein. The condition is marked by infiltration of the coats of the vein and the formation of a thrombus.  The disease is attended by edema, stiffness, and pain in the affected part[.]" Dorland's Illustrated Medical Dictionary, 1279 (27th Ed. 1988).

with Dr. Nazar who stated that "[t]here are no signs of active bleeding or infection. There is no evidence of phlebitis.  We retrieved the stitches today.  He will continue with the same protocol. He will return to this office for follow up in six weeks, sooner if any problems." Tr.  214.

Vernarec had an appointment with Dr. Nazar on April 22, 2005. Tr. 214.  According to Dr. Nazar's notes Vernarec was "doing quite all right, although he still has some pain and discomfort, and a locking sensation with flexion and extension. Overall he is doing fine." Id.  Dr. Nazar observed "no signs of effusion" and "no evidence of phlebitis." Id.  Dr. Nazar gave Vernarec a prescription for Vicodin.[20] Id.

On July 22, 2005, Vernarec had an appointment with Dr. Nazar. Tr. 213.  The notes of that appointment state that Vernarec "is doing much better and has less pain and discomfort.  He now has pain and discomfort at the level of the lumbar spine.  He is taking Vicodin with some relief of the symptoms." Id.  Dr. Nazar gave Vernarec a prescription for Vicodin and scheduled a follow-up appointment in six weeks.  Id.

A separate treatment note dated July 22, 2005, states: "Incisions were healed [illegible] Takes Vicodin for back pain[.] Starts work in N.C. on Monday." Tr. 214.

---

20. Vicodin, a combination of acetaminophen and hydrocodone, is a narcotic pain reliever.  Vicodin, Drugs.com, http://www.drugs.com /vicodin.html (Last accessed September 6, 2011).

15

In a treatment record dated January 9, 2006,  Dr. Nazar or a nurse working for Dr. Nazar stated that Vernarec was "doing alright . . . but not perfect [complains of] soreness in am [and] locking sensation. Will be starting work [at] Taylor. Needs DPW reassessment done." Tr. 212.  In a separate note Dr. Nazar stated as follows: "Today for follow up of right knee arthroscopy, doing better, less pain and discomfort, has good range of motion, no evidence of effusion, Lachman and MacMurray test negative, no signs of phlebitis.  I will discharge this patient to return to this office for follow up in 6 weeks, sooner if any problems." Id.

On April 6, 2006, Vernarec had an appointment with his primary care physician Constance M. Sweet, M.D. Tr. 251-252.  At that appointment Vernarec complained of pain, swelling and stiffness in the knees and back pain.  Id.  A physical examination of Vernarec revealed essentially normal findings[21] except that his blood pressure was 142/92 and his knees were tender but without swelling. Id.  Dr. Sweet concluded that Vernarec suffered from back and knee pain and prescribed the drug Percocet,[22] and considered ordering an MRI of the lumbar spine, physical therapy and referral to Dr. Nazar

---

21. Dr. Sweet's treatment notes were set forth on a medical form that provided that a "✓" mark would equal a normal finding and an "X" would equal an abnormal finding.  There were no "Xs" on the form.

22. Percocet, a combination of oxycodone and acetaminophen, is a narcotic pain reliever. Percocet, Drugs.com, http://www.drugs. com/percocet.html (Last accessed September 6, 2011).

for injections. Id.  Dr. Sweet also noted that Vernarec suffered from high blood pressure and Vernarec's blood pressure should be monitored. Id.

On May 1, 2006, Vernarec had an appointment with Dr. Sweet at which Vernarec complained of back and knee pain. Tr. 253.  He had no new complaints and it was noted that his high blood pressure and back pain were stable. Id.  A physical examination reveal essentially normal findings except his blood pressure was 142/86. Id.  Dr. Sweet prescribed Metoprolol for Vernarec's high blood pressure. Id.

On June 8, 2006, Vernarec had an appointment with Dr. Sweet regarding his knees and back. Tr. 255.  Vernarec complained about tingling and numbness in his right hand and painful knees. Id. Vernarec stated he was using 5 to 6 Percocet per day. Id.  A physical examination revealed essentially normal findings. Id. Vernarec's blood pressure was 112/86. Id.  Dr. Sweet's assessment was that Vernarec suffered from chronic low back pain and noted that Vernarec "needs reevaluation - MRI etc." Id.  She further stated that a "contract for narcs was signed."[23] Id.

On June 12, 2006, Dr. Sweet wrote the following on a prescription slip: "David is not employable currently due to

_____

23. This was a document signed by Vernarec in which he stated, inter alia, that he would not abuse the prescription drugs and only take the medications as prescribed. Tr. 271.

multiple problems." Tr. 276.

On July 7, 2006, Vernarec had an appointment with Dr. Sweet at which he stated Percocet was helping a lot and he was able to function at a limited level with minimum pain but any increase in activity caused an increase in pain. Tr. 256.  Physical examination findings were essentially normal except he had an unspecified decrease in range of motion of the back and back spasms. Id. Vernarec's blood pressure was 110/70. Id.  Vernarec told Dr. Sweet that he was unable to get an MRI and X-rays because he had no insurance.  Dr. Sweet's assessment was that Vernarec suffered from chronic low back pain. Id.  Dr. Sweet stated that an MRI would be scheduled as soon as Vernarec's medical assistance was approved. Id. Dr. Sweet continued Vernarec's prescriptions for Percocet and Metoprolol. Id.

Also, on July 7, 2006, Dr. Sweet completed a form entitled "Pennsylvania Department of Public Welfare Employability Assessment Form." Tr. 223-224.  In that form Dr. Sweet stated that Vernarec was permanently disabled because of low back pain, knee arthritis and high blood pressure.  Id.  Dr. Sweet did not complete a statement of Vernarec's functional abilities.[24]

---

24. Such statements generally include, *inter alia*,  information regarding an individual's ability to lift, carry, walk, stand, sit, climb, stoop, kneel, crawl, push and pull with the upper and lower extremities,  work at heights and around moving machinery, engage in fine and gross manipulation with hands, and be exposed to heat, cold, fumes, dust and other environmental elements.

On August 15, 2006, Vernarec had an appointment with Dr.
Sweet at which he stated he had fair control of his low back pain
with Percocet. Tr. 257.  He also stated that his medical assistance
was approved and he would like to get back on Paxil[25] and Xanax for
anxiety. Id.  Physical examination findings were normal. Id.
Vernarec's blood pressure was 120/70. Id.   Dr. Sweet's assessment
was that Vernarec suffered from low back pain and she continued him
on Percocet, ordered an MRI, and prescribed Paxil for depression and
anxiety. Id.

On September 5, 2006, Vernarec had an appointment with Dr.
Sweet at which Vernarec stated he was "going back to work next
week." Tr. 258.  Physical examination findings were normal. Id.
Vernarec's blood pressure was 110/60. Id.  Dr. Sweet assessment was
that Vernarec suffered from chronic back pain and noted that
Vernarec could not get an MRI because Vernarec was starting a job.
Id.  Dr. Sweet continued Vernarec's prescription for Percocet and
noted that Vernarec's high blood pressure was stable. Id.

Also, on September 5, 2006, Vernarec was examined by Ihab
Dana, M.D., on behalf of the Bureau of Disability Determination. Tr.
227-231.  Dr. Dana observed that Vernarec was able to sit, bend,
walk, and lift and had a normal gait, station, deep tendon reflexes,
and ranges of motion except for flexion and extension of his knee

_____

25. Paxil is drug used to treat, *inter alia*,  depression and
anxiety. Paxil, Drugs.com, http://www.drugs.com/paxil.html (Last
accessed September 6, 2011).

and hip. Tr. 228.

On October 2, 2006, Vernarec had an appointment with Dr. Sweet at which he told Dr. Sweet that he went back to work, he has stiffness and pain in the morning, and he uses 4 to 5 Percocet per day for pain control. Tr. 259.  Physical examination findings were normal. Id.  Dr. Sweet's assessment was that Vernarec suffered from back pain and anxiety and continued Vernarec's prescription for Anaprox,[26] Percocet and Xanax, and started Vernarec on Flexeril.[27] Id.

On October 6, 2006, Mark Bohn, M.D., a physician with the Bureau of Disability Determination, reviewed the medical records and concluded that Vernarec could perform a limited range of light work. Tr. 232-237.  Specifically, Dr. Bohn stated that Vernarec could occasionally lift and/or carry 20 pounds and frequently 10 pounds; Vernarec could stand and/or walk about 6 hours in an 8-hour workday; Vernarec could sit about 6 hours in an 8-hour workday; Vernarec was limited in his ability to push and/or pull with his lower extremities because of decreased range of motion; Vernarec could occasionally stoop, kneel, crouch, crawl and climb stairs and

---

26. Anaprox (also know as Aleve), a nonsteroidal anti-inflammatory drug, is used to treat pain and inflammation. Anaprox, Drugs.com, http://www.drugs.com/mtm/anaprox.html (Last accessed September 6, 2011).

27. Flexeril, a muscle relaxant, is used, inter alia,  to treat pain. Flexeril, Drugs.com, http://www.drugs.com/flexeril.html (Last accessed September 6, 2011).

frequently use ramps but he could never climb ladders, ropes or
scaffolds; Vernarec had no manipulative, visual, and communicative
limitations; and Vernarec should avoid concentrated exposure to
extreme temperatures, fumes, odors, dusts, gases, poor ventilation,
and hazards. Id.  Dr. Bohn stated that the evidence establishes
medically determinable impairments of degenerative joint disease of
the knees and lumbosacral spine, high blood pressure and depression.
Tr. 237.  Dr. Bohn further noted that Vernarec did not attend
physical therapy, did not require an assistive device to ambulate,
and had no difficulty ambulating as observed by field office
personnel who interviewed him.  Id.

On October 30, 2006, Vernarec had an appointment with Dr.
Sweet at which Vernarec stated he was still working, that he slipped
on a poll the previous week and wrenched his back and that he was
working 6 days per week with shorter daylight. Tr. 260.  He also
stated that his anxiety was "Ok" with Xanax. Id.  Physical
examination finding were essentially normal. Id.  His blood pressure
was 130/86 which is a slightly elevated reading. Id.  Vernarec was
assessed as suffering from back pain and anxiety. Id.   He was
continued on the drugs Percocet, Anaprox and Xanax. Id.

On November 27, 2006, Vernarec had an appointment with Dr.
Sweet at which Vernarec stated he had knee and back pain but that he
"climbs polls for a living" and he was using 6 Percocet per day and
that his anxiety and spasms were stable. Tr. 261.  Physical

examination findings were essentially normal. Id.  His blood pressure was 122/88. Id.  Vernarec was assessed as suffering from chronic back and leg pain. Id.  He was continued on the drug Percocet Id.

On December 26, 2006, Vernarec had an appointment with Dr. Sweet "for monthly chronic pain visit."  Tr. 262.  No abnormal physical examination finding were noted except his blood pressure was slightly elevated at 130/90. Id.  He was assessed as suffering from "chronic pain" and continued on Percocet. Id.  It was also noted Vernarec had "some mild depression." Id.

On February 8, 2007, Vernarec had an appointment with Dr. Sweet for a respiratory infection. Tr. 263.  It was noted by Dr. Sweet that Vernarec needed a "return to work slip." Id.  The only abnormal physical examination findings related to his respiratory infection. Id.  Vernarec was diagnosed with "Bronchitis/Sinusitis" and prescribed Biaxin, an antibiotic. Id.

On March 19, 2007, Vernarec had an appointment with Dr. Sweet for chronic pain management and monthly medication review. Tr. 264.  At that appointment Vernarec stated he was working out of town, he needed an increased dose of medication because of an injury, and he had no new problems. Id.  A physical examination revealed normal findings. Id.  Dr. Sweet's assessment was that Vernarec suffered from chronic pain and continued Vernarec's prescription for Percocet and considered starting Vernarec on

22

Oxycontin. Id.

On April 19, 2007, Vernarec had an appointment with Dr. Sweet for chronic pain management. Tr. 265.  At that appointment Vernarec stated that he just lost his job and that he was taking 7 Percocet per day and was "not sure he [could decrease] soon." Id. Physical examination findings were essentially normal. Id.  His blood pressure was 124/82. Id.  Dr. Sweet's assessment was that Vernarec was suffering from chronic back and knee pain. Id. Dr. Sweet decreased his dosage of Percocet to 5 per day but noted she would consider increasing the dosage to 6 to 8 per day if he returned to work. Id.

On May 17, 2007, Vernarec had an appointment with Dr. Sweet for chronic pain management. Tr. 266.  At that appointment Vernarec stated that he got a new job, he was still having a hard time with his knees, he was taking 5 Percocet tablets per day and he need an increase to 6 Percocet tablets per day because of his work. Id.  Physical examination findings were essentially normal. Id.  His blood pressure was 138/72.  Id.  Dr. Sweet's assessment was that Vernarec suffered from knee pain and increased his dosage of Percocet to 6 per day. Id.

On June 11, 2007, Vernarec had an appointment with Dr. Sweet for chronic pain management and regarding his anxiety. Tr. 267.  Physical examination findings were normal.  Id.  His blood pressure was 116/78. Id.  Dr. Sweet's assessment was that Vernarec

23

suffered from chronic back and knee pain and anxiety. Id.  She prescribed Percocet and Xanax. Id.

On August 8, 2007, Vernarec had an appointment with Dr. Webb. Tr. 348-351.  Prior to this appointment the last time Vernarec had an appointment with Dr. Webb was on November 28, 2004.  Dr. Webb's notes of this appointment state that Vernarec was complaining of "chronic low back pain and knee pain . . . He has had knee pain and back pain and says his back pain is about 99% of his problem. . . He is going to start a new job on Monday of this week." Tr. 350. Dr. Webb's physical examination findings were essentially normal. Vernarec's blood pressure was 130/84; nothing abnormal was observed about Vernarec's head, neck, chest, abdomen, cardiovascular system, respiratory system, and ears, nose and throat; Vernarec's back was nontender, he was able to do straight leg raises to 80 to 90 degrees bilaterally[28] and he had full range of motion in hips bilaterally; Vernarec reflexes were essentially normal ("2+ bilaterally"); and Vernarec's "knees moved well with no obvious lesions." Tr. 348-351.  Dr. Webb discussed with Vernarec his need to stop taking Percocet "because it [was] too strong for him."  Tr. 248-250.  Dr.

---

28. The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed September 6, 2011).

Webb discontinued his prescription for Percocet and prescribed Vicodin.  Tr. 351.[29]

On October 29, 2007, Vernarec had an appointment with Dr. Webb for a medication review. Tr. 277-278 and 352-353.  Vernarec told Dr. Webb that he did not like taking Vicodin because it upset his stomach and preferred Percocet because it controlled his pain enough to allow him to work.  Dr. Webb's physical examination findings at this appointment were essentially normal except Vernarec blood pressure was 146/80 and he had some tenderness to palpation in the lumbosacral region of the spine. Tr. 352.  Dr. Webb had a long discussion with Vernarec about the use of pain medication. Tr. 353. He told Vernarec that he could not continue "just giv[ing] him pain medicines without any evaluation" but did give him a prescription for Percocet "to take one, four times a day." Id.

On November 20, 2007, Dr. Webb told Vernarec that he had to obtain an evaluation of his back or he could not continue on pain medications. Tr. 357.  Physical examination findings on November 20, 2007, were essentially normal except Vernarec's blood pressure was 140/92 and he had tenderness in the lumbosacral region of the spine. Id.  Also, at an appointment on December 20, 2007, physical examination findings were essentially normal except Vernarec had

---

29. Dr. Webb's treatment notes are extremely confusing because there is also a record of an appointment on September 26, 2007, that is essentially the same as the August 8, 2007, appointment report.  Tr. 354-355.

tenderness in the lumbosacral region of the spine.  Tr. 360.

On January 10, 2008, Vernarec had an MRI of the lumbar
spine which revealed degenerative spondylosis at the L5-S1 level of
the spine. Tr. 279.  The MRI did not reveal evidence of spinal
stenosis, neural compression, focal disc herniation or other
abnormality. Id.

On January 21, 2008, Vernarec had an appointment with Dr.
Webb regarding his low back pain.  Tr. 280.  The "after visit
summary" of this appointment reveals that the diagnosis was
lumbosacral spondylosis without myelopathy,[30] high blood pressure,
and "unspecified backache."  Id.  Vernarec was referred by Dr. Webb
to neurosurgery for evaluation.  Id.  Dr. Webb prescribed Percocet
and discontinued Vernarec's prescription for Xanax. Id.  Dr. Webb
noted that Percocet was "not [a] long term [treatment] for
[Vernarec]." Tr. 364.

On February 20, 2008, Vernarec had a follow-up appointment
with Dr. Webb at which he voiced no new complaints.  Tr. 365-366.
Vernarec reported that he had been drinking the night before. Id.
Vernarec's blood pressure was 154/100. Id.  Physical examination
findings were essentially normal except for Vernarec's blood
pressure and some tenderness in the lumbosacral region of the spine.

---

30. Myelopathy is "a general term denoting functional disturbances
and/or pathological changes in the spinal cord; the term is often
used to designated nonspecific lesions, in contrast to
inflammatory lesions (myelitis)." Dorland's Illustrated Medical
Dictionary, 1088 (27th Ed. 1988).

Id.

On February 27, 2008, LaRue Montayne, D.Ed., a licensed psychologist, performed a consultative psychological evaluation of Vernarec on behalf of the Bureau of Disability Determination. Tr. 281-285.  Vernarec reported that he had attempted suicide in 2002 and again "2 days ago." Tr. 282.  With regard to the recent suicide attempt, Vernarec claimed he consumed 50 Xanax,[31] refused treatment by emergency personnel and refused to be taken to the hospital in an ambulance. Id.  He told Dr. Montayne that the suicide attempt "was just something to do." Id.  Vernarec denied current ideas of suicide. Id.  Dr. Montayne stated that Vernarec suffered from Major Depressive Disorder; Vernarec's ability to understand, remember and carry out instructions was not affected by his mental impairment; Vernarec could interact appropriately with the public and supervisors; Vernarec had a slight limitation in his ability to interact appropriately with coworkers, a marked limitation in his ability to respond appropriately to work pressures in a usual work setting, and a moderate limitation in his ability to respond appropriately to changes in a routine work setting.  Tr. 282 and 285.

On March 3, 2008, John N. Grutkowski, Ph.D., a state agency psychologist, reviewed the medical records and concluded that

---

31. This allegations appears to be inconsistent with Dr. Webb discontinuing Vernarec prescription for Xanax on January 21, 2008.

Vernarec suffered from Major Depressive Disorder; Vernarec
impairment did not meet or equal the requirements of a listed mental
health impairment; Vernarec was not significantly limited in his
ability to understand and remember locations and work-like
procedures and simple and detailed instructions; Vernarec was not
significantly limited in his ability to carry out simple
instructions, maintain attention and concentration for extended
periods, maintain a schedule and regular attendance, sustain an
ordinary routine without special supervision, work in coordination
with others without being distracted by them, and make simple work-
related decisions; and Vernarec was markedly limited in his ability
to carry out detailed instructions.  Tr. 289, 296 and 299.  Dr.
Grutkowski concluded that Vernarec is "able to meet the basic mental
demands of competitive work on a sustained basis despite the
limitations resulting from his impairment." Tr. 301.

On March 19, 2008, Vernarec had an appointment with Dr.
Webb at which he voiced no new complaints. Tr. 368-369.  Physical
examination findings were essentially normal except Vernarec's blood
pressure was 132/84 and he had tenderness in the lumbosacral region
of the spine.  Id.

On or about March 24, 2008, Vernarec was treated for
contusions of the face and head sustained when someone hit him with
a 2 by 4. Tr. 371-373.  There is no indication there were lasting
injuries from this assault because at an appointment on April 17,

2008, Vernarec only complained about low back pain. Tr. 375.

On April 7, 2008, R. Craig Nielsen, M.D., performed a consultative examination of Vernarec on behalf of the Bureau of Disability Determination. Tr. 302-309.  Vernarec told Dr. Nielsen that "[h]e lives with his fiancé in their son's trailer now.  Smokes two packs of cigarettes a day. . . drinks beer a six-pack every few days . . . [has] a history of being an alcoholic . . . ." Tr. 304. Dr. Nielsen's physical examination of Vernarec was essentially normal. Tr. 304-305.  Dr. Nielsen observed that Vernarec's gait was normal; he walked without an assistive device; he readily got on and off the examination table and in and out of a chair; he could readily squat and get up from squatting; he could heel and toe walk; and he had no problems sitting, bending, standing, lifting, grasping, or walking. Tr. 305.  Dr. Nielsen also observed that Vernarec's light touch sensation was intact, a motor examination was normal, deep tendon reflexes were normal and equal, straight leg raise testing was negative, and there was no atrophy. Id.  Vernarec had full range of motion in his spine, shoulders, elbows, wrists, knees, hips, and ankles. Tr. 308-309.  He had no pain or effusion in his knees. Tr. 305.  Dr. Nielsen found that Vernarec could occasionally lift and/or carry 25 pounds; Vernarec had no limitations sitting and pushing and pulling; Vernarec could occasionally bend, kneel, stoop, crouch, balance, and climb; and Vernarec should not be around moving machinery.  Tr. 306-307.

29

On April 18, 2008, Vernarec had an x-ray of the lumbar spine which revealed "some minimal degenerative changes [] in the posterior articulating facets at L4-5 and L5-S1." Tr. 327.

On or about April 20, 2008, Vernarec attempted suicide by slitting his left wrist with a pocketknife. Tr. 333.  Vernarec was transported by ambulance to the emergency department at Robert Packer Hospital, Sayre, Pennsylvania. Id.  An outpatient emergency record dated April 29, 2008, notes some of the circumstances surrounding this suicide attempt as follows:

> The patient is a 42-year-old male who states that around 6:00 p.m. tonight he began drinking.  He states he had four beers.  He became depressed and took 50 Xanax tablets of 1 mg each and 50 Toprol-XL tablets of 50 mg each.  He denies taking Paxil but had some brought with him to the Emergency Department.  He also states that he took out a pocketknife and cut his left wrist.  He denies taking any additional medications or attempting to harm himself in any other way.  He denies any falls.  He denies hitting his head or having any loss of consciousness, nausea, vomiting, neck pain, back pain, chest pain, shortness of breath, abdominal pain, or pain in his extremities other than the laceration site.

Tr. 333.  Another medical record from Robert Packer Hospital dated April 21, 2008, states in part as follows:

> Patient . . . states that his intention was to kill himself, but he is glad he is not deceased . . . He further tells me that he has been feeling depressed since 2001 when his wife divorced him.  He had four overdose attempts in the past.  For the last four years, he has been using illicit drugs, particularly Oxycontin, Percocet, cocaine, alcohol, and on 4/20/2008 patient used 2 grams of cocaine, #60 pills of OxyContin or Percocet. He took two fentanyl patches. He dissolved the material in water and then shot it in his vein.  He smokes three packs per day.  He feels

> helpless and has no control over his drug use. . .
> Both the patient and his girlfriend are prescribed
> Percocet and OxyContin, and they use it
> interchangeably.  There are times when they both
> run out of medication.  They go through withdrawal
> until they find OxyContin pills on the street where
> they have spent $1000 to get #20 pills to abort with
> withdrawal.

Tr. 335.  The laceration on Vernarec's wrist was shallow and 4

centimeters in length. Tr. 332.  A Blood test taken at the hospital

at the time of admission revealed that his blood alcohol level was

.099 percent, slightly over the legal limit. Tr. 342.  Testing of

his urine revealed the presence of cocaine. Tr. 338.

Vernarec was admitted to the Intensive Care Unit for close

monitoring and observation. Tr. 332.  His Global Assessment of

Functioning (GAF) score at the time of admission to the ICU was

25.[32]  Tr. 336.  He stayed at the hospital until April 28, 2008, at

---

32. The GAF score allows a clinician to indicate his judgment of a
person's overall psychological, social and occupational
functioning, in order to assess the person's mental health
illness. *Diagnostic and Statistical Manual of Mental Disorders*
3-32 (4th ed. 1994). A GAF score is set within a particular range
if either the symptom severity or the level of functioning falls
within that range. Id. The score is useful in planning treatment
and predicting outcomes. Id.  A GAF score of 21-30 represents
behavior considerably influenced by delusions or hallucinations
or serious impairment in communication or judgment or inability
to function in almost all areas.  A GAF score of 31-40 represents
some impairment in reality testing or communication or major
impairment in several areas,  such as work or school, family
relations, judgment, thinking or mood. Id.  A GAF score of 41-50
indicates serious symptoms or any serious impairment in social,
occupational or school functioning.  Id.  A GAF score of 51 to 60
represents moderate symptoms or any moderate difficulty in
social, occupational, or school functioning. Id. A GAF score of
61 to 70 represents some mild symptoms or some difficulty in
social, occupational, or school functioning, but generally

which time he was discharged and transferred to Cove Forge

Behavioral Health System, Williamsburg, Pennsylvania, for inpatient

rehabilitation. Tr. 346.  At the time of his discharge from the

hospital, his discharge diagnosis was substance-induced mood

disorder; substance withdrawal, particularly opiate withdrawal;

polysubstance dependence; major depressive disorder, severe,

recurrent without psychotic features; and dysthymic disorder. Tr.

330.  His Global Assessment of Functioning (GAF) score at the time

of discharge was 40.  Id.

On May 12, 2008, Vernarec was discharged from Cove Forge

Behavioral System after successfully complet[ing] all [of] their

treatment plans and goals."  Tr. 343.

On May 19, 2008, Vernarec had an appointment with Dr. Webb

complaining of a respiratory infection. Tr. 377.  Physical

examination findings were essentially normal except Vernarec's blood

pressure was 140/62 and he had occasional rhonchi[33] when breathing.

Tr. 378-379.  Dr. Webb noted that Vernarec had normal range of

motion in his neck and musculoskeletal system. Id.  The notes of

this appointment also indicate that Vernarec was drinking "48 Can(s)

_____

functioning pretty well with some meaningful interpersonal
relationships. Id

33. A website of the National Institute of Health describes
rhonchi as "sounds that resemble snoring. They occur when air is
blocked or becomes rough through the large airways." Breath
Sounds, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency
/article/003323.htm (Last accessed September 8, 2011).

of beer per week, occasional 4 12 pks." Id. [34]  Dr. Webb's
assessment was that Vernarec was suffering from acute bronchitis,
high blood pressure and lumbosacral spondylosis without myelopathy.
Id.

On May 21, 2008, Vernarec was evaluated at Northern Tier
Counseling and given a GAF score of 52. Tr. 417.  The evaluator
could not rule out a diagnosis of depression, not otherwise
specified or a mood disorder. Id.  A mental status examination
revealed normal findings. Tr. 418.  It was noted that his motivation
for treatment was "poor" and he might be engaging in "possible drug
seeking" behavior. Tr. 418 and 420.  With respect to Vernarec's
physical health it was stated that he had moderate functional
impairments. Tr. 419.

A document prepared by Northern Tier Counseling on June
16, 2008, indicates that Vernarec's was suffering from a depressed
mood and anxiety, he had a GAF score of 45 and he should attend
counseling sessions 3 days per week. Tr. 421.  The psychiatric
diagnosis code was 292.89 which represents a substance induced

---

34. Venarec testified at the administrative hearing that the
medical record should have said 4 to 8 beers per week. Tr. 56.
However, he did not explain the "occasional 4 12 pks" notation.
However, the report also states alcohol use "28.8 oz/wk" which is
inconsistent with 48 cans of beer per week.  Dr. Webb has this
notation in virtually every subsequent report of a medical
appointment with Vernarec.  Vernarec told Dr. Nielsen on April 7,
2008, that he drank a 6-pack of beer every few days. Tr. 304.

disorder.[35] <u>Id.</u>

On June 18, 2008, Vernarec had an appointment with Dr. Webb at which he requested that Dr. Webb increase his dose of Percocet and write him a prescription for Xanax. Tr. 380.   Physical examination findings were essentially normal except Vernarec's blood pressure was 132/86 and he had tenderness to palpation in the lumbosacral region of the spine. Tr. 381-382.  Dr. Webb's assessment was that Vernarec was suffering from "unspecified backache" and high blood pressure. <u>Id.</u>  Dr. Webb stated that he would not change Vernarec's medications until Vernarec consulted with a neurosurgeon. <u>Id.</u>

On July 9, 2008, Vernarec had an appointment with Erik M. Gregorie, M.D., a neurosurgeon. Tr. 383-384.  Dr. Gregorie's report of that consultation states in pertinent part as follows:

> At present Mr. Vernarec is unemployed.  He smokes 1 ½ packs of cigarettes a day and has done so for 25 years. He notes he does not consume alcohol. This is in marked contrast to the note contained in a progress note by Dr. Paul Webb on 6/18/2008.  In that note it is listed that he consumes approximately 48 cans of beer per week.
>
> *    *    *    *    *    *    *    *    *    *    *
>
> The patient appears to be in no acute distress. . . . Station and gait are normal.  Muscle strength is normal in both arms and legs.  Motor tone is normal in both upper and lower extremities.

---

35. Diagnostic and Statistical Manual of Mental Disorders 19 (4th ed., Text Revision, 2000).

NEUROLOGICAL: Oriented to time, place and person.
Memory appears to be grossly intact. Language function
appears to be normal with normal receptive
and motor speech function.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

Radiology: MRI of the lumbar spine shows a degree of
lumbar spondylosis.  The most marked change is at the L5-
S1 disc.  There are lesser changes at L4-L5 and
L2-L3.  There is no central canal stenosis.  There is
no spondylolisthesis.[36]  The neural foramina[37] at all levels
are relatively well preserved.

IMPRESSION: I told Mr. Vernarec I would not recommend
consideration for surgery.  At the present time has
arthritic change in the lumbar spine but no
surgical lesions.  I gave him a referral for Physical

---

36. "The word spondylolisthesis derives from two parts - spondylo
which means spine, and listhesis which means slippage. So, a
spondylolisthesis is a forward slip of one vertebra (i.e., one of
the 33 bones of the spinal column) relative to another.
Spondylolisthesis usually occurs towards the base of your spine
in the lumbar area. . . Spondylolisthesis can be described
according to its degree of severity. One commonly used
description grades spondylolisthesis, with grade 1 being least
advanced, and grade 5 being most advanced. The spondylolisthesis
is graded by measuring how much of a vertebral body has slipped
forward over the body beneath it." Spineuniverse.com,
Spondylolisthesis: Back Condition and Treatment, http://www.
spineuniverse.com/conditions/spondylolisthesis/spondylolisthesis-
back-condition-treatment (Last accessed September 8, 2011). Grad
1 spondylolithesis is where up to 25% of the vertebral body has
slipped forward over the vertebral body beneath it. Id. Symptoms
of this condition include pain in the lower back, pain and
weakness in one or both legs, and an altered gait. Id.  Some
people who have this condition exhibit no symptoms. Id.


37. The neural foramen is "the space through which nerve roots
exit the spinal canal . . . Each foramen is a bony canal formed
superiorly and inferiorly by the pedicles of two adjacent
vertebrae[.]" Neural foramen, Medcyclopaedia, http://www.
medcyclopaedia.com/library/topics/volume_vi_1/n/neural_foramen.as
px (Last accessed September 8, 2011).

> Therapy.  I have asked him to follow up with Dr. Webb
> for consideration for use of anti-inflammatory
> medications.  I told Mr. Vernarec that the Percocet he
> is taking is something that is not a long-term solution
> and he will certainly at some time in the future need
> to be weaned from this medication.

Id.

On July 17, 2008, Vernarec had an appointment with Dr. Webb complaining of back pain. Tr. 454.  Physical examination findings were essentially normal except Vernarec's blood pressure was 144/94 and he had tenderness in the lumbosacral region of the spine. Tr. 454-455.  Dr. Webb's assessment was that Vernarec suffered from lumbosacral spondylosis without myelopathy, high blood pressure and "unspecified backache." Id.  Dr. Webb had a long discussion with Vernarec about the need for physical therapy and to get off Percocet. Id.  He also discussed "vocational training" with Vernarec. Id.

On August 19, 2008, Vernarec had an appointment with Dr. Webb at which Vernarec complained of back pain. Tr. 452.  Dr. Webb had a long discussion with Vernarec regarding his failure to go to counseling. Id.  Vernarec told Dr. Webb that he had some depression but no suicidal ideations and no hallucinations. Id.  Physical examination findings were essentially normal except Vernarec's blood pressure was 140/90 and he had tenderness in the lumbosacral region of the spine. Id.  Dr. Webb's assessment was that Vernarec suffered from lumbosacral spondylosis without myelopathy, high blood pressure and depression. Id.

On September 17, 2008, Vernarec had an appointment with
Dr. Webb complaining of back and joint pain, depression and a
painful left knee after stacking wood. Tr. 449.  Vernarec requested
a prescription for Xanax which was denied by Dr. Webb.  Id.
Physical examination findings were essentially normal except
Vernarec's blood pressure was 140/82 and he exhibited tenderness in
the lumbar region of the spine. Id.  Dr. Webb's assessment was that
Vernarec suffered from lumbosacral spondylosis without myelopathy,
high blood pressure and depression.  Tr. 450.

On October 15, 2008, Vernarec had an appointment with Dr.
Webb at which he requested an increase in the dosage of Percocet.
Tr. 445.  Physical examination findings were essentially normal
except Vernarec's blood pressure was 136/90 and he exhibited
decreased range of motion in the knees and tenderness in the lumbar
region of the spine. Tr. 447.  Dr. Webb's assessment was that
Vernarec suffered from "unspecified backache," lumbosacral
spondylosis without myelopathy, high blood pressure, and depression.
Id.  Dr. Webb referred Vernarec to physical therapy and refused to
increase the dosage of Percocet. Id.

On October 23, 2008, Vernarec visited the emergency
department at Robert Packer Hospital, Sayre, Pennyslvania.,
reporting that he had suicidal thoughts but no plan. Tr. 385.  He
had an odor of alcohol on his breath and he claimed that he had been
taking Nyquil which contains alcohol. Id.  His blood alcohol level

37

was .033 which is below the legal limit. Id.  Vernarec was referred
to crisis management. Id.

On November 17, 2008, Vernarec had an appointment with Dr.
Webb at which he complained of back pain and depression. Tr. 441-
442.  Vernarec told Dr. Webb he had not been attending counseling.
Id.  Other than some tenderness in the lumbar region of the spine
physical examination findings were essentially normal. Tr. 443.  His
blood pressure was 124/76. Id.  Dr. Webb noted that he "[a]ctually
looks better today." Tr. 444.

On December 17, 2008, Vernarec had an appointment with Dr.
Webb at which he complained of back pain. Tr. 440.  At that
appointment he admitted he never went to physical therapy as Dr.
Gregorie recommended and that he was not in counseling but was
"doing okay." Id.  He stated he was not drinking alcohol. Id.
Physical examination findings were essentially normal. Id.  His
blood pressure was 128/72. Id.  Dr. Webb's assessment was that
Vernarec was suffering from lumbosacral spondylosis without
myelopathy, depression, high blood pressure and tobacco abuse.  Id.
Vernarec stated he would try physical therapy. Tr. 441.

On January 16, 2009, Vernarec had an appointment with Dr.
Webb at which Vernarec stated his back pain was the same and he
voiced no new concerns. Tr. 435 and 437.  It was noted Vernarec did
not go to physical therapy. Tr. 437.  Physical examination findings
were normal except Vernarec's blood pressure was 152/86 and he

exhibited tenderness in the lumbar region of the spine. Id.  Dr. Webb's assessment was that Vernarec was suffering from lumbosacral spondylosis without myelopathy, depression, high blood pressure and tobacco abuse.  Tr. 438.

On February 16, 2009, Vernarec had an appointment with Dr. Webb at which Vernarec stated his back pain was the same and he voiced no new concerns.  Tr. 433.  He also stated he was not depressed.  Tr. 434.  Physical examination findings were normal except Vernarec's blood pressure was 150/86.  Tr. 434.  Dr. Webb's assessment was that Vernarec was suffering from lumbosacral spondylosis without myelopathy, depression and high blood pressure. Tr. 435.

On March 2, 2009, Vernarec visited the emergency department at Robert Packer Hospital "complaining of feeling increasing depression."  Tr. 390.  He stated that he had "not been taking his medications," that he felt "hopeless" and was thinking about "stabbing himself." Id.  Physical examination findings were essentially normal except his blood pressure was 159/100. Id. Vernarec was admitted to the hospital for observation. Id.  Steven Cohen, D.O., a psychiatrist who examined Vernarec after admission noted the following: "He has a very extensive substance abuse history, which includes needle use for methamphetamine and also cocaine abuse.  His last usage of these hard drugs, he reports was about one year ago . . . He also admits to having a problem with

alcohol but states not currently; however notes in the chart indicate that he is still drinking excessively and his drug screen was positive for benzodiazepines." Tr. 391.   Mental status examination findings by Dr. Cohen were normal. Id.   Dr. Cohen's impression was that Vernarec suffered from a mood disorder, a history of polysubstance abuse and could not rule out bipolar disorder. Tr. 392.   Dr. Cohen gave Vernarec a GAF score of 30 and admitted him to the psychiatric unit. Id.   Dr. Cohen discharged Vernarec on March 6, 2009, with a final diagnosis of mood disorder, alcohol abuse and a history of polysubstance abuse.   Tr. 393-394. At the time of discharge Dr. Cohen's mental status findings of Vernarec were normal[38] and he gave Vernarec a GAF score of 58 to 60. Tr. 394.

On March 18, 2009, Vernarec had an appointment with Dr. Webb complaining of back pain Tr. 430.   Physical examination findings were essentially normal except Vernarec's blood pressure was 142/88 and he exhibited tenderness in the lumbar region of the spine. Tr. 432.   Dr. Webb's assessment was that Vernarec was

---

[38]. Dr. Cohen stated that Vernarec "was alert and oriented times three and not confused.  His memory was intact for recent and remote events.  His hygiene was good.  He was pleasant and cooperative.  He made good eye contact.  His speech was spontaneous.  It was normal in rate and tone. His mood was euthymic.  His affect was appropriate.  There were no suicidal thoughts.  His thoughts were organized.  There were no auditory or visual halucinations.  No paranoid delusions. His judgment, insight, and intellectual capacity were adequate and assets were that he was motivated for aftercare."  Tr. 393.

suffering from "unspecified backache," lumbosacral spondylosis without myelopathy, and high blood pressure. Tr. 432.  Vernarec was directed to attend counseling for depression at Northern Tier Counseling. Id.

On April 17, 2009, Vernarec had an appointment with Dr. Webb at which he complained of back pain and requested a refill of his prescription for Percocet. Tr. 428-429.  Physical examination findings were essentially normal except Vernarec's blood pressure was 124/90. Tr. 429-430.  Dr. Webb's assessment was that Vernarec was suffering from "unspecified backache," depression and high blood pressure.  Tr. 430.  Dr. Webb made no change in Vernarec's medications and stated Webb was "doing okay." Id.  It was noted that Vernarec had not attended counseling at Northern Tier Counseling. Tr. 428.

On May 18, 2009, Vernarec had an appointment with Dr. Webb at which Vernarec stated that his depression was better when he was not lounging around the house and that he was "helping an old lady around her farm" and she was "getting him out to do stuff.  Tr. 425. He further stated that his backache was the same. Id.   Physical examination findings were essentially normal except Vernarec's blood pressure was 140/84 and he had tenderness in the lumbosacral region of the spine. Tr.  427.  Dr. Webb's assessment was that Vernarec was suffering from "unspecified backache," depression and high blood pressure.  Tr. 427.

41

The last medical appointment of which there is a record of in the transcript of the administrative proceedings occurred on June 12, 2009.  On that date Vernarec had an appointment with Dr. Webb regarding his back pain. Tr. 423-425.  Physical examination findings were essentially normal except Vernarec's blood pressure was 144/90 and he had tenderness in the lumbosacral region of the spine. Id.   Dr. Webb's assessment was that Vernarec was suffering from "unspecified backache" and depression. Id.  Dr. Webb stated that he would not issue scripts for medications until July 10, 2009, because Vernarec took extra pills. Id.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Vernarec did not engage in substantial gainful work activity from February 2005 through August 2006 and from July 1, 2007, through the date of his decision. Tr. 16.  The administrative law judge did find that Vernarec had a one-month unsuccessful work attempt (January 2005) and that Vernarec did engage in substantial gainful activity from September 2006 through June 2007. Tr. 15.

At step two of the sequential evaluation process, the administrative law judge found that Vernarec had the following severe impairments: degenerative spondylosis, knee pain, major depressive disorder and an anxiety-related disorder. Tr. 16.  The

42

administrative law judge concluded that Vernarec's high blood
pressure was a non-severe impairment because there was no evidence
it caused any functional limitations.   Id.

At step three of the sequential evaluation process the
administrative law judge found that Vernarec's impairments did not
individually or in combination meet or equal a listed impairment. Tr.
16-18.

At step four of the sequential evaluation process the
administrative law judge found that Vernarec could not perform his
past relevant skilled, medium work as a cable installer but that
Vernarec had the residual functional capacity to perform a limited
range of unskilled, light work. Tr. 18 and 22.  Specifically, the
administrative law judge found that Vernarec could perform light work
where he could

> sit or stand on a self-directed basis.  The claimant
> is limited to occupations permitting nor more than
> occasional operation of foot controls due to lower
> extremity limitations.  Similarly, the claimant should
> no more than occasionally be required to ascend ladders,
> ropes, scaffolds, ramps, stairs, or engage in postural
> activities such as balancing, stooping, crouching,
> crawling, or kneeling.  The claimant should not be in
> occupations requiring anything more than moderate
> exposure to hazards such as moving machinery, motor
> vehicles, automotive equipment, and unprotected heights.
> Lastly, the claimant should not be engaged in occupations
> that include repeated or persistent contact with the
> general public and should only be in a predictable
> stable setting with few workplace changes, limited
> requirements for the exercise of independent judgment
> or decision making, and involving only simple matters
> free of complex written instructions and characterized
> by a clear regiment of work activity.

Tr. 18.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Vernarec had the ability to perform work as a trimmer, assembler and tagger, and that there were a significant number of such jobs in the Northeastern region of Pennsylvania. Tr. 23.

The administrative record in this case is 473 pages in length, primarily consisting of medical and vocational records. Vernarec's primary argument is that the administrative law judge erred by failing to accept the opinions of Dr. Sweet and other treating physicians.[39]

No treating physician has provided a functional assessment of Vernarec indicating that Vernarec is unable to perform any type of work.  In fact there are four functional assessments in the

_____

39. Vernarec also argues that (1) the administrative law judge failed to appropriately develop the record and (2) the administrative law judge failed to address properly Vernarec's work history.  These arguments lack merit.  The administrative law judge adequately developed the record.  Vernarec has not pointed to or proffered any additional medical evidence.  As for failing to address Vernarec's work history, evidence of Vernarec's work history was presented prior to and during the administrative hearing and we are confident that the administrative law judge was well-aware of it.  To the extent that the administrative law judge did not specifically comment on Vernarec's work history in his decision when assessing Vernarec's credibility, we find this omission harmless in light of the medical evidence and because the administrative law judge agreed with Vernarec that he could not perform his prior skilled, medium work as a cable installer.

record which reveal that Vernarec has the ability to engage in at least a limited range of light work.  Those functional assessments were addressed in detail in our review of the medical records.  The opinions of Dr. Dana, Dr. Bohn, Dr. Grutkowski, and Dr. Nielson support the administrative law judge's conclusion that Vernarec can perform a limited range of light work.

The Court of Appeals for this circuit has set forth the standard for evaluating the opinion of a treating physician in Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000).  The Court of Appeals stated in relevant part as follows:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." . . . The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled.  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.

Id. at 317-18 (internal citations omitted). The administrative law judge is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(d).

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported by medically acceptable clinical and laboratory

45

diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence.  An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements.  20 C.F.R. § 404.1508 (2007).  In this case the administrative law judge appropriately considered the contrary medical opinions of Dr. Dana, Dr. Bohn, Dr. Grutkowski, and Dr. Nielson and the objective medical evidence and concluded that the conclusory opinion of Dr. Sweet set forth in the Department of Public Welfare form was not adequately supported by objective medical evidence consisting of signs, symptoms and laboratory findings.  The administrative law judge gave an adequate explanation for rejecting the opinion of Dr. Sweet.  Furthermore, there were no other treating physicians who provided functional assessments which conflicted with the residual functional capacity set by the administrative law judge in his decision of August 10, 2009.

In addition to appropriately considering Vernarec's physical limitations, the administrative law judge appropriately took into account Vernarec's mental limitations in his residual functional capacity assessment.  The administrative law judge limited Vernarec to work of a simple, predictable nature with few

workplace changes and which did not involve persistent contact with the general public.  Also, as previously stated, Dr. Grutkowski stated that Vernarec was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." Tr. 301.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the

decision of the Commissioner.

An appropriate order will be entered.


S/ James M. Munley
JAMES M. MUNLEY
United States District Judge


Dated: September 8, 2011

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DAVID VERNAREC,                    :
                                   :
        Plaintiff                  :     No. 4:10-CV-1275
                                   :
    vs.                            :     (Complaint Filed 6/18/10)
                                   :
MICHAEL ASTRUE,                    :
COMMISSIONER OF SOCIAL             :     (Judge Munley)
SOCIAL SECURITY,                   :
                                   :
        Defendant                  :


<u>ORDER</u>

In accordance with the accompanying memorandum, **IT IS
HEREBY ORDERED THAT:**

1.   The Clerk of Court shall enter judgment in favor of
the Commissioner and against David P. Vernarec as set forth in the
following paragraph.

2.   The decision of the Commissioner of Social Security
denying David P. Vernarec disability insurance benefits and
supplemental security income benefits is affirmed.

3.   The Clerk of Court shall close this case.


            <u>s/ James M. Munley</u>
            JAMES M. MUNLEY
            United States District Judge

Dated: September 8, 2011

49